UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

ROBERT MILTON SALEWSKY,

                    Plaintiff,                    Case No. 2:11-cv-281

v.                                           Honorable R. Allan Edgar

Michigan State Police Trooper
STEVE OLSON, #633, and Michigan
State Police Trooper DANIEL BARTELL,
#1748,

                    Defendants.
_____/

## MEMORANDUM AND ORDER

       This suit arises out of an encounter between Plaintiff Robert Milton Salewsky and

Defendants Michigan State Police Troopers Steve Olson and Daniel Bartell.  Defendants

have filed a motion for summary judgment, pursuant to Fed. R. Civ. P. 56.  Doc. No. 18.

The Court has reviewed that motion and its accompanying brief, along with the response,

reply, and surreply briefs, and the matter is now ready for decision.

## Standard of Review

       Summary judgment pursuant to Fed. R. Civ. P. 56 is only appropriate if there are no

genuine issues of material fact in dispute and the moving party is entitled to judgment as

a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986); *Van Gorder v. Grand Trunk Western Railroad, Inc.*, 509 F.3d 265, 268 (6th Cir.

2007).  Material facts are those facts that might affect the outcome of the action under the

governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995).

In deciding a summary judgment motion, the Court must view the facts in the record and all reasonable inferences that can be drawn from those facts in the light most favorable to the plaintiff. *Anderson*, 477 U.S. at 251-52; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court cannot weigh the evidence, judge credibility of witnesses, or determine the truth of matters reasonably in dispute. *Anderson*, 477 U.S. at 249; *Talley*, 61 F.3d at 1245.

The defendant bears the initial burden of demonstrating there are no genuine issues of material fact in dispute. The defendant may satisfy this burden either by presenting affirmative evidence that negates an essential element of Plaintiff's claim, or by demonstrating the absence of evidence to support a claim. *Celotex Corp.*, 477 U.S. at 325; *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). Once the defendant meets this initial burden, the plaintiff is required to come forward with probative evidence and facts to support his claim and show that a trial is necessary to resolve a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249; *Van Gorder*, 509 F.3d at 268. A scintilla of evidence is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 251-52. Rather, there must be admissible evidence on which a reasonable jury could find in the plaintiff's favor. *Anderson*, 477 U.S. at 252; *Van Gorder*, 509 F.3d at 268.

## Facts

The following facts are asserted by Plaintiff: on the evening of August 28, 2009, Plaintiff went to his brother Randy's house at around 5:30 p.m. Pl. Dep., Doc. No. 19-2, Ex. 1, p. ID 128, at p. 49 of dep. Plaintiff drank approximately four or five twelve-ounce beers there. *Id.*, p. ID 129, at p. 51 of dep. At around 9:00 or 9:30 p.m., Plaintiff, his brother Randy, his sister Marlene, and Marlene's boyfriend went to Dino's Pine Knot, a bar in

Menominee, Michigan.  *Id.*, p. ID 129, at p. 52 of dep; p. ID 121, at p. 20 of dep.  Plaintiff

states that the bar was "packed," with about 25 to 30 people inside of a bar that could hold

approximately 45 people, and that "[e]verybody was dancing and having a great time,

having drinks."  *Id.*, p. ID 130, at p. 54 of dep.; p. ID 129, at p. 53 of dep.  Plaintiff consumed

"[m]aybe another six or seven" beers at Dino's.  *Id.*, p. ID 132, at p. 62 of dep.  Plaintiff also

thinks that he might have done a couple shots, that were "[p]robably Jack Daniels or

tequila."  *Id.*, p. ID 132, at p. 63.

At some point, two bar patrons, Bobby Paris and Scotty Husbeck, got into an

altercation. Pl. Dep., Doc. No. 19-2, Ex. 1, p. ID 133, at p. 67 of dep.  Bobby told Scotty that

he did not want to wrestle or "mess around" because of a hurt knee.  *Id.*  When Scotty

would not calm down, Bobby slammed him against the wall in the corner of the bar and held

him up by his throat against the wall.  *Id.*  Bobby then exited the bar and stood outside.  *Id.*

Bobby's girlfriend went outside after him.  *Id.*, p. ID 135, at pp. 74-75 of dep.   Bobby

continued to yell at Scotty through the window next to the bar's front door.  *Id.*, at p. 75 of

dep.

Throughout this altercation, Plaintiff was seated at the bar, two stools away from the

window.  *Id.*, p. ID 135, at p. 75 of dep.  Plaintiff saw a police car drive past the bar, do a u-

turn, and pull up in front of the bar.  *Id.*, p. ID 133, at p. 68 of dep.; p. ID 136, at p. 78 of

dep.  Plaintiff yelled out the word "police" or the word "cops."  *Id.*, p. ID 136, at pp. 79-80 of

dep.  Plaintiff then told his friend Tony, who was sitting by him at the bar, that he was going

to "go get them guys[.]" Pl. Dep., Doc. No. 19-2, Ex. 1, p. ID 136, at p. 80 of dep.  Plaintiff

asserts that he made that statement because he planned on bringing Bobby and his

girlfriend back inside the bar, so that they would not "get in trouble for being outside the bar,

3

you know, drunk, disorderly conduct, or public intoxicant or whatever[.]" *Id.*  Tom LaCombe,

another bar patron sitting at the bar who Plaintiff did not know, said, "No, you're not."  *Id.*,

p. ID 137, at p. 82 of dep.  Plaintiff spun around his swivel bar stool and stood up.  *Id.*, at

pp. 83-85 of dep.  At the same time that Plaintiff was standing up from his stool, he said

"who the fuck are you?"  *Id*.  Plaintiff states that this statement was directed at LaCombe,

because he did not know him.  *Id.*, p. ID 138, at p. 86 of dep.  After Plaintiff had spun

around and stood up from his stool, he found two police officers standing about three feet

in front of him.  *Id.*, p. ID 137, p. 84 of dep.; p. ID 138, at p. 86-87 of dep.  The officers were

Defendants Bartell and Olson.

Plaintiff then began to head for the door, when LaCombe came up behind him and

grabbed him in a "full nelson."  *Id.*, p. ID 138, at p. 87 of dep.  Plaintiff described the "full

nelson" as follows: "[h]e comes up behind you and gets your arms like above your head and

wrapped and tangled in his and then behind your head . . . [with his hands] locked behind

my neck."  *Id.*, p. ID 138, at pp. 87-88 of dep.  According to Plaintiff, after LaCombe grabbed

him,

> I'm looking at the police like waiting for them to do something
> because I'm being assaulted here, you know, and they are just
> standing there looking at me.  Well, the pain is getting worse
> and worse because he's tightening down . . . After about four or
> five seconds of that and the police just looking at me dumb and
> not going to help me out, I broke free, head butted him and
> broke free out of his full nelson.

Pl. Dep., Doc. No. 19-2, Ex. 1, p. ID 139, at pp. 90-91 of dep.  Plaintiff head-butted

LaCombe one time in the chest, and was able to get an arm out of the hold.  *Id.*, at pp. 91-

92 of dep.  After breaking free from LaCombe, Plaintiff began walking toward his brother

and sister down at the end of the bar.  *Id.*, p. ID 140, at p. 94 of dep.  Plaintiff took three

steps and was tased by Defendant Bartell.  *Id.*, at p. 96 of dep.  Plaintiff did not hear any

orders from the Defendants before the tasing occurred.  *Id.*, at p. 97 of dep.

Plaintiff was hit in the back with the taser and fell forward onto his face.  Pl. Dep.,

Doc. No. 19-2, Ex. 1, pp. ID 140-41, at pp. 97-98 of dep.  Plaintiff started cussing at the

officers.  *Id.*, at p. 99 of dep.  Plaintiff told the officers that he was going to sue them and

was going to fuck them in the ass.  *Id.*, at pp. 100-101 of dep.  Plaintiff lifted his head and

shoulders off the ground, and was starting to bring his hands up in front of him so that he

could get up, when he was tased a second time by Defendant Bartell.  *Id.*, at p. 100 of dep.

After the second tasing, Plaintiff describes the following:

> I just remember seeing a lot of feet and I remember the
> bartender coming around the bar as I was laying there because
> after the second tase I told myself I'm not moving, I'm not even
> moving, they are going to carry me out of this bar.  That's
> exactly what I told myself.  Because I remember everybody, I
> remember my brother Randy freaking out, yelling at the cops,
> and my sister and Terry Nerat, a bunch of people, the bartender
> coming around the bar and she started yelling at the bar (sic)
> asking him why he tased me, what the hell because I didn't do
> nothing.  And then he threatened to tase her if she didn't get
> back behind the bar.

Pl. Dep., Doc. No. 19-2, Ex. 1, p. ID 142, at p. 102 of dep.  Plaintiff laid still and was

handcuffed.  *Id.*, at p. 103 of dep.  Plaintiff was picked up by Officer Olson and Officer

Foster, who had arrived at the scene, and escorted toward the door.  *Id.*, at p. 105 of dep.

Plaintiff let his legs drag behind him while this was happening.  *Id*.  Plaintiff explains:

> As they were dragging me out, I turned my head to the right
> toward the officer that had tased me and my sister was right
> there yelling at him, asking him why he did this to me, and I
> turned my head to my sister, and I said, Marlene, are you
> seeing this, and at that time he tased me the third time.

Pl. Dep., Doc. No. 19-2, Ex. 1, p. ID 143, at p. 108 of dep.  Plaintiff indicates that he did not break away from the officers to go back into the bar to tell Defendant Bartell that he was going to "kick his fucking ass."  Trial, Doc. No. 27-3, p. ID 735.  This third tasing occurred about two feet from the front door of the bar.  Pl. Dep., p. ID 144, at p. 110 of dep.  Plaintiff states that the officers let go of him at the time of the third tasing, and that he fell out on the street, on the concrete.  *Id*.  The officers then picked Plaintiff back up and walked him to the police car.  *Id.*, p. ID 145, at pp. 114-15 of dep.

Defendant Bartell asserts the following version of the evening's events: Defendant Bartell and Defendant Olson stopped at the bar after witnessing a physical altercation outside involving six to eight male subjects, several of whom were shoving each other. Incident Report, Doc. No. 19-7, Ex. 6, p. ID 215.  In the incident report, Defendant Bartell stated that two of the male subjects entered the bar and began shoving and arguing inside, and that one of these subjects was Plaintiff.  *Id*.  In his deposition, Defendant Bartell stated that he originally believed that Plaintiff and another individual were outside arguing and went in to continue their argument, but that he could not be certain that they were both outside the bar.  Bartell Dep., Doc. No. 19-8, Ex. 7, p. ID 226, at p. 18 of dep.

While standing outside, Defendant Bartell observed Plaintiff and another individual "jostling in the bar, pushing one another."  *Id.*, at p. 21 of dep.  At that point, Defendant Bartell entered the bar and yelled "hey."  *Id*.  Plaintiff initially had his back to Defendant Bartell, but turned toward him at that point and began "approaching [him] in an aggressive, unwanted manner."  *Id*.  Specifically, Defendant Bartell asserts that Plaintiff said "who the fuck are you" after turning toward him, and had his fists clenched, with "veins ... bulging out of his neck, eyes ... about to pop out of his head[.]"  *Id*.  Defendant Bartell was certain that

6

Plaintiff's "who the fuck are you" comment was addressed toward him because he was looking him right in the eyes from five to ten feet away.  *Id.*, p. ID 227, at p. 22 of dep.  In the incident report, Defendant Bartell stated that this statement showed inactive resistance, as it was obvious that Plaintiff was trying to intimidate him.  Incident Report, Doc. No. 19-7, Ex. 6, p. ID 215.  Defendant Bartell asserts that Plaintiff took two or three steps toward him. Bartell Dep., p. ID 227, at p. 22 of dep.   At that point, Defendant Bartell asserts that LaCombe grabbed Plaintiff.  *Id.*, at pp. 22-23 of dep.  According to Bartell, Plaintiff "became enraged" and began "assaulting LaCombe" by butting his head against LaCombe's chest. Incident Report, Doc. No. 19-7, Ex. 6, p. ID 215.  Defendant Bartell viewed the head-butting as active aggression.  Incident Report, Doc. No. 19-7, Ex. 6, p. ID 215.  Plaintiff was eventually able to break free from LaCombe, and Defendant Bartell tased him as he twisted away from LaCombe.  Bartell Dep., Doc. No. 19-8, Ex. 7, p. ID 229, at p. 32 of dep. Defendant Bartell states that he deployed the taser at that time because "I thought once he broke free from Mr. LaCombe that he was coming at me and I tased him to prevent myself from being assaulted."  *Id.*, at p. 33 of dep.  Defendant Bartell states that Plaintiff was not coming at him at the time he deployed the taser.  *Id*.  The prongs struck Plaintiff in the back and he fell to the floor.  *Id*.

At that point, the crowd began to close in on the officers, preventing Defendant Olson from placing Plaintiff in handcuffs.  Incident Report, Doc. No. 19-7, Ex. 6, p. ID 216. Defendant Bartell asserts that Plaintiff started pushing himself up with his arms and had started to get up.  Bartell Dep., Doc. No. 19-8, Ex. 7, p. ID 230, at pp. 34-35 of dep.  In the critical incident report, Defendant Bartell stated that this displayed active aggression, as Plaintiff was "enraged and advancing toward" him.   Incident Report, Doc. No. 19-7, Ex. 6,

p. ID 216.  At that point, Defendant Bartell tased Plaintiff again "[b]ecause I was in fear of him getting up and assaulting me."  Bartell Dep., p. ID 230, at p. 35 of dep.  When asked to elaborate, Defendant Bartell stated the following:

> Just based on his actions.  I know myself, if I had just got tased by the police I'd be staying on the ground, but he didn't, he started to get up.  He was obviously enraged and at that point there was no doubt in my mind that he was going to get up and come after me.

*Id.*, at pp. 35-36 of dep.  Defendant Olson then handcuffed Plaintiff.  *Id.*, at p. 37 of dep.  As Plaintiff was led to the front door by Defendant Olson and Officer Foster, he pushed back on them, yelling obscenities and yelling to his sister Marlene.  *Id.*, p. ID 231, at p. 38 of dep.  Plaintiff then twisted back toward Defendant Bartell, broke free from the officers, and yelled "I'm going to kick your fucking ass" at Defendant Bartell while in Defendant Bartell's face.  *Id.*, p. ID 233, at p. 46 of dep.  Defendant Bartell viewed this behavior as active aggression, as Plaintiff was making threats and advancing toward him.   Incident Report, Doc. No. 19-7, Ex. 6, p. ID 216.  Defendant Bartell then deployed the taser a third time on Plaintiff, and Plaintiff fell out the doorway of the bar.  *Id.*  Plaintiff was helped to his feet and taken to the patrol car, which he refused to get into.  *Id.*  Plaintiff was eventually placed in the patrol car.  *Id.*

Defendant Olson asserts the following version of the evening's events: he states that he and Defendant Bartell stopped at the bar to prevent the situation outside from escalating.  Olson Dep., Doc. No. 19-9, Ex. 8, p. ID 240, at p. 6 of dep.  Defendant Olson was separated from Defendant Bartell.  *Id.*, at p. 7 of dep.  Defendant Olson heard Defendant Bartell yell something from the bar, and ran inside.  *Id.*, at p. 8 of dep.  Defendant Olson did not see anyone fighting, and was scanned the room to determine who Defendant Bartell had been

addressing, when he heard the sound of the taser being activated.  *Id.*, p. ID 241, at p. 10 of dep.  Defendant Olson then approached Plaintiff to apply handcuffs, but was unable to do so because people were standing around him and getting in Defendant Olson's way. *Id.*, at pp. 11-12 of dep.  Plaintiff, who was on the ground at the time, tried to get back up on his feet.  *Id.*, at p. 12 of dep.  Specifically, Defendant Olson states that Plaintiff was starting to bend his legs to get his feet underneath him in order to push himself up off the floor.  *Id.*, at pp. 12-13 of dep.  Defendant Olson does not recall whether Plaintiff tried to get his hands under himself or whether he started pushing with his hands.  *Id.*, at p. 13 of dep. Defendant Olson was unable to get control of Plaintiff's hands to apply the handcuffs because they were "moving around."  *Id.*, p. ID 242, at p. 14 of dep.  No commands were given by the officers to Plaintiff at this time.  *Id*.  Plaintiff was tased a second time; after the second tasing, Defendant Olson handcuffed Plaintiff.  *Id.*, at p. 15 of dep.  Defendant Olson and Officer Foster, who had arrived at the scene, began to escort Plaintiff out of the bar. Plaintiff was yelling and swearing at this point.  *Id.*, at pp. 15-16 of dep.  According to Defendant Olson, the following occurred as they reached the door:

> As we were trying to get out the door we started to blade in a manner that three people could get out the door while still handing on to Mr. Salewsky.  Sergeant Foster was going to go out the door, she is on Salewsky's right side holding on to him with her left arm.  I am on his left side holding him with my right arm, kind of like this, under his armpit.  As we're doing this Mr. Salewsky starts to try to spin out of Foster's grip and he was successful at doing that, he was able to get an arm free.

Olson Dep., p. ID 242, at p. 17 of dep.  Defendant Olson believed that Plaintiff was trying to spin out of his grip by turning counterclockwise.  *Id*.  At that point, the taser was activated for the third time.  *Id*.  Plaintiff "locked up" and started to fall away from Defendant Olson, and then fell to the ground.  *Id.*, p. ID 243, at p. 18 of dep.  Defendant Olson asserts that

he could not have held Plaintiff up at that point, since he only had him by one arm.  *Id*. According to Defendant Olson, Plaintiff engaged in disorderly conduct by yelling, swearing, and making threats in the bar.  *Id.*, p. ID 244, at p. 23 of dep.  He states that he heard Plaintiff say "I'm going to kick your ass or words to that effect."  *Id.*, p. ID 245, at p. 26 of dep.  He further states that Plaintiff engaged in resisting arrest by trying to pull away from him when he was attempting to put handcuffs on him.  *Id.*, p. ID 245, at p. 23 of dep.

In her deposition, Officer Foster also asserts that Plaintiff pulled away from her as she was helping escort him through the bar.  Foster Dep., Doc. No. 19-10, Ex. 9, p. ID 254, at p. 22 of dep.  She states that she did lose her grip on him, and that the taser then went off.  *Id*.  She states that Plaintiff then fell forward onto the threshold of the door.  *Id*.

LaCombe provided a written statement on the night of the incident, in which he stated the following: "A male subject tried to attack a state trooper & [sic] I tried to restrain him, but they needed to deploy a taser weapon in defense of themselves."  Doc. No. 19-6, Ex. 5, p. ID 213.  During his deposition, LaCombe stated that he was "pretty intoxicated" during the night in question.  LaCombe Dep., Doc. No. 19-5, p. ID 203, at p. 15 of dep.  LaCombe states that, after the officers entered the bar, "[t]hey indicated they wanted to talk to" Plaintiff and "waved their finger" at him.  *Id.*, p. ID 204, at p. 20 of dep.  At that point, according to LaCombe:

> [Plaintiff] started coming at him [sic] and, I mean, he looked like he was pretty upset so I got ahold of him, you know, because I didn't want him to go after – you know, it looked to me like he was going to go after them[.]

*Id.*, at pp. 20-21 of dep.  When asked what he meant by that statement, LaCombe stated that Plaintiff "looked aggressive" to him.  *Id.*, at p. 21 of dep.  Later in his deposition, LaCombe made the following statement about Plaintiff: "I thought maybe he was going to

10

go after the police officer but I couldn't tell you what he was thinking."  *Id.*, p. ID 205, at p.

24 of dep.  LaCombe assumed that Plaintiff's "who the fuck are you" statement was made

to the police officer, but stated that Plaintiff could have been talking to LaCombe.  *Id.*, at p.

25 of dep.  Plaintiff struggled once LaCombe grabbed hold of him, but LaCombe was not

sure how Plaintiff got loose and did not remember Plaintiff head-butting him.  *Id.*, p. ID 206,

at p. 26 of dep.  Once Plaintiff had freed himself, he was tased and hit the ground.  *Id.*

      Plaintiff's sister, Marlene Seid, described the incident as follows:

> Then a cop drove past.  My brother Robert saw those two
> arguing.  He's like I'm going to go get those guys back in here,
> and when he started to walk out LaCombe grabbed him and put
> him like in a full nelson and Robert said, What are you doing,
> and kind of wiggled his way out of it and he turned back by me
> and he started walking towards me and that's when the cops
> came in and Robert was facing me and he got tased and fell
> right in front of me.

Seid Dep., Doc. No. 19-3, Ex. 2, p. ID 173, at p. 37 of dep.  Seid did not remember Plaintiff

saying "who the fuck are you" at any point.  Seid explained that, once Plaintiff broke free

from LaCombe, he walked toward her, and took "three strides, maybe."  *Id.*, p. ID 176, at

p. 47 of dep.  At that point, Plaintiff fell.  *Id.*, p. ID 178, at p. 54 of dep.  Seid states that she

did not realize why Plaintiff fell until she "saw the wires sticking out of his back and a police

officer standing behind him."  *Id.*

      Seid also asserts that "after the first time [Plaintiff] got tased [the officers] said to stay

down.  And I remember him lifting his head to kind of like turn his head, and that's when

they tased him again."  *Id.*, p. ID 183, at p. 74 of dep.  When asked if Plaintiff had stayed

down at that point, Seid responded: "Yeah, he never – he couldn't get up.  He never got up.

He moved his head."  *Id.*

Plaintiff's brother, Randy Nicoll, stated that he turned and saw someone holding Plaintiff in a full nelson. Nicoll Dep., Doc. No. 19-4, Ex. 3, p. ID 191, at pp. 23-25 of dep. He saw Plaintiff get out of it, turn around, and head "towards the pool table, towards the back," before falling to the ground. *Id.*, p. ID 192, at p. 27 of dep. Nicoll first noticed the officers when Plaintiff had fallen to the ground. *Id.*, p. ID 193, at p. 30 of dep. Nicoll witnessed the second tasing, and states that Plaintiff was "just locked up pretty much" between the first and second tasings. *Id.*, p. ID 194, at p. 34 of dep. Nicoll then left the bar because he was threatened that he would be arrested. *Id*.

At Plaintiff's criminal trial, Susan Nerat stated that she was sitting at the bar next to Plaintiff during the night in question. Trial, Doc. No. 27-2, p. ID 716. Susan said that there was a struggle and Plaintiff was tased on the ground. *Id.*, p. ID 718. When asked if she saw Plaintiff being held in a "half nelson", Susan said no. *Id.*, p. ID 720. When asked if Plaintiff got aggressive before he was tased for the second time, Susan said no. *Id.*, p. ID 719. Susan indicated that she did not see Plaintiff aggressively pull away from the officer and come back after the officer before he was tased for the third time. *Id.*, p. ID 720.

Terry Nerat also testified at Plaintiff's criminal trial. Terry was outside the bar and did not see the first tasing. Trial, Doc. No. 31-3, p. ID 979. Terry looked through the door and saw Plaintiff on the ground following the first tasing. *Id.*, p. ID 980. When asked if Plaintiff attempted to get up from the ground to go after the officer, Terry said no. *Id.*, p. ID 980. Scott Husbeck testified at Plaintiff's criminal trial. He stated that he saw Plaintiff walking back toward the bar as he was tased the first time. Trial, Doc. No. 27-3, p. ID 776. Husbeck indicated that Plaintiff did not attempt to get up from the ground to go after the officer at that point. *Id.*, p. ID 777. Robert Paris testified at Plaintiff's trial as well. Paris

stated that he saw Plaintiff being held by LaCombe and struggling to get out of it.  Trial,

Doc. No. 27-3, p. ID 794.  Plaintiff did a head-butt and got out of LaCombe's grip.  *Id*.  He

then "turned right around to the bar" and was tased.  *Id*.  Doug Short testified at Plaintiff's

trial, and indicated that he saw Plaintiff get off his bar stool and walk toward the door before

LaCombe grabbed him.  Trial, Doc. No. 31-3, p. ID 1022.  He further indicated that Plaintiff

did not look like he was angry or upset at that point.  *Id*.

      The taser download report indicates that the taser was activated at 1:23:56 a.m.,

1:24:09 a.m., and 1:26:10 a.m., for five seconds each time.

      Plaintiff was transferred to Menominee County Jail and lodged for the following

offenses: a misdemeanor of being a disorderly person, contrary to M.C.L. § 750.167, and

a felony of resisting/obstructing a police officer, in violation of M.C.L. § 750.81d1.  Booking

Sheet, Doc. No. 19-12, Ex. 11, p. ID 261.  At a preliminary examination on September 29,

2009, Judge Barstow found probable cause to bind Plaintiff over on both charges.  Doc. No.

19-13, Ex. 12, pp. ID 311-12.  Judge Barstow made the following findings at that hearing:

> The evidence shows that on August 29th, 2009, in the City and
> County of Menominee, State of Michigan, specifically, at Dino's
> Bar on 13th Street, defendant was in some type of
> disagreement and/or altercation with another patron at that
> particular establishment.  Trooper Bartell was, in fact,
> performing his duties, and he was adequately identified as a
> State Police trooper.  That, in fact, he tried to intervene with
> regard to the argument.  That defendant did obstruct, endanger,
> and/or oppose him by threatening the use of physical force, by
> his actions and his words.  That he did that on a couple
> occasions, the initial occasion and a couple after that.  Uh, that
> he continued for a period of time to -- to resist the State Police
> Troopers, City Police Officer Foster, and uh -- that's it, I guess.

*Id*.  Plaintiff was acquitted of the felony on July 23, 2010, following a jury trial.  On the same

date, an order of nolle prosequi was entered as to the misdemeanor charge.  Doc. No. 31-2.

Plaintiff filed the present lawsuit on July 26, 2011.  Doc. No. 1.  Plaintiff included the following counts in his complaint: (I) Violation of Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures and not to be subject to excessive force (42 U.S.C. § 1983); (II) Conspiracy to Violate Plaintiff's Civil Rights (42 U.S.C. § 1985); (III) Malicious Prosecution (42 U.S.C. § 1983); (IV) False Arrest and Imprisonment; (V) Assault and Battery; (VI) Gross Negligence; and (VII) Common Law Malicious Prosecution.  The Court granted Defendants' motion to dismiss Plaintiff's gross negligence claim on May 3, 2012.  Doc. No. 11.[1]

## Qualified Immunity

Defendants Bartell and Olson argue that they are entitled to qualified immunity with regards to Plaintiff's § 1983 claims against them.   Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful.  *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

---

[1] Plaintiff attaches various unsworn statements to his response to Defendants' motion for summary judgment.  *See* Doc. No. 29-30, Ex. 13-17.  "[A] court may not consider unsworn statements when ruling on a motion for summary judgment."  *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir. 2010), *quoting Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991).  The Court will therefore not consider these statements in analyzing this motion.

The procedure for evaluating claims of qualified immunity is tripartite: First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999). If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). The plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

## Excessive Force

Defendants argue that Plaintiff's excessive force claim must fail because an objectively reasonable officer could have concluded that the use of the taser was reasonable under the circumstances. As the Sixth Circuit recently explained:

> An excessive force inquiry turns on "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). If all material facts are undisputed, the reasonableness of officer conduct in an excessive-force claim is a question of law that a court may decide. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). In general, a plaintiff need not demonstrate a physical injury. Instead, "[i]n determining whether there has been a violation of the Fourth Amendment, we consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010) (internal quotation marks omitted). "Not every push or shove, even if it may later seem unnecessary in

15

the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted).  Factors used to gauge whether there has been excessive force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [an arrestee] is actively resisting arrest or attempting to evade arrest by flight." *Id*.

*Stricker v. Twp. of Cambridge*, -- F.3d --, 2013 WL 141695, at *11 (6th Cir. Jan. 14, 2013).

Several factual disputes exist in this case.  These include Plaintiff's involvement or lack of involvement in an altercation prior to the officers' entrance into the bar; Plaintiff's demeanor after standing up from his bar stool; whether Plaintiff took steps toward Defendant Bartell or toward the door after standing from his bar stool; the distance that Plaintiff traveled after breaking free from LaCombe before being tased for the first time; whether Defendants issued commands to Plaintiff after he had been tased the first time and was on the ground; Plaintiff's physical actions before being tased the second time; and Plaintiff's physical actions before being tased the third time.

The Court finds that resolution of these disputed facts would require it to make credibility determinations and to weigh the evidence, which it is unable to do at this point. The Court further finds that resolution of these disputed facts is necessary to determine whether Plaintiff was actively resisting arrest and whether he posed an immediate threat, and therefore whether the force used by Defendant Bartell was objectively reasonable.  *See Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) (pepper spraying a plaintiff who was walking away from an officer but who was not under arrest constituted excessive force); *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (excessive force has been found to have occurred where suspects were compliant or had stopped resisting). Plaintiff has presented sufficient evidence of genuine issues of material fact with regard to

whether an objectively reasonable officer could have concluded that the use of the taser was reasonable under the circumstances.  Therefore, since there is an issue about whether a constitutional violation occurred, Defendant Bartell is not entitled to qualified immunity.

In his complaint, Plaintiff argues that Defendant Olson had "a duty to intercede and prevent his fellow officer from employing unnecessary and excessive force."  Doc. No. 1, p. ID 4, ¶ 22.  "[A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  The Sixth Circuit has "recognized a duty of protection only where the 'underlying episode of excessive force ... spanned a sufficient period of time for a nearby defendant to both perceive what was happening and intercede to stop it."  *Kowolonek v. Moore*, 463 Fed. Appx. 531, 539 (6th Cir. 2012), *quoting Ontha v. Rutherford County*, 222 Fed. Appx. 498, 506 (6th Cir. 2007).  Plaintiff has failed to allege or provide evidence indicating that Defendant Olson had sufficient time during any of the three tasings to both perceive them and to intercede to stop them.  The taser was activated for only five seconds each, and the three tasings occurred within a three minute span.  Plaintiff's excessive force claim against Defendant Olson will therefore be dismissed.

### False Arrest/Imprisonment

Defendants argue that Plaintiff's false arrest and imprisonment claim fails because it cannot be disputed that Defendant Bartell had probable cause to arrest Plaintiff.  "In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause."  *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal

citation omitted).  "A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000), *citing Beck v. Ohio*, 379 U.S. 89, 91 (1964).  In making a probable cause determination, the Court must examine "all facts and circumstances within an officer's knowledge at the time of an arrest." *Id.*, *quoting Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999).  "Probable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry." *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006) (internal citation omitted).

Defendants argue that they had probable cause to arrest Plaintiff for, at the very least, disorderly conduct.  Doc. No. 19, p. ID 102.  The relevant sections of the "disorderly person" statute state the following:

> A person is a disorderly person if the person is any of the following:
> ...(e) a person who is intoxicated in a public place and who is either endangering directly the safety of another person or of property or is acting in a manner that causes a public disturbance;
> ... (l) a person who is found jostling or roughly crowding people unnecessarily in a public place.

M.C.L. § 750.167.  Defendants argue that Plaintiff's struggle with LaCombe established probable cause to arrest him for being disorderly.  The Court agrees.  Defendant Bartell asserts that he witnessed Plaintiff, while being held in a full-nelson position, head-butt LaCombe.  Plaintiff admits that he head-butted LaCombe.  Regardless of who started this altercation, there is no dispute that Plaintiff was involved in a physical altercation and used physical force against LaCombe.  The Court finds no genuine issue of material fact as to whether probable cause existed to arrest Plaintiff for being disorderly.  Given the existence of probable cause, Plaintiff has failed to establish a Constitutional violation with regard to

18

his false arrest/false imprisonment claims.  Defendants are therefore entitled to summary

judgment on those claims.

### Malicious Prosecution

Defendants argue that they are entitled to summary judgment because Plaintiff

cannot establish the necessary elements of a Fourth Amendment malicious prosecution

claim.  The following elements are required:

> First, the plaintiff must show that a criminal prosecution was
> initiated against the plaintiff and that the defendant made,
> influenced, or participated in the decision to prosecute.
> Second, because a § 1983 claim is premised on the violation of
> a constitutional right, the plaintiff must show that there was a
> lack of probable cause for the criminal prosecution.  Third, the
> plaintiff must show that, as a consequence of a legal
> proceeding, the plaintiff suffered a deprivation of liberty, as
> understood in our Fourth Amendment jurisprudence, apart from
> the initial seizure.  Fourth, the criminal proceeding must have
> been resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) (internal citations and quotations

omitted).  Defendants argue that Plaintiff cannot show that either of the Defendants made,

influenced, or participated in the decision to prosecute because the prosecutor made the

decision to charge Plaintiff.  The Sixth Circuit "has held that a police officer cannot be liable

for Fourth Amendment malicious prosecution when he did not make the decision to bring

charges, so long as the information he submitted to the prosecutor is truthful."  *Kinkus v.*

*Village of Yorkville*, 289 Fed. Appx. 86, 91 (6th Cir. 2008), *citing Skousen v. Brighton High*

*School*, 305 F.3d 520, 529 (6th Cir. 2002).  With regard to Defendant Olson, there is no

indication that he submitted any information to the prosecutor or judge.  Defendant Bartell

signed the incident report and was the only person to testify at the preliminary exam.

Defendant Olson is therefore entitled to summary judgment on Plaintiff's malicious prosecution claim.

Defendant Bartell argues that Plaintiff cannot show the absence of probable cause with regard to his malicious prosecution claim. As was discussed previously, probable cause existed to arrest Plaintiff. For that reason, Defendant Bartell is entitled to summary judgment on Plaintiff's § 1983 malicious prosecution claim.

### Conspiracy

Defendants argue that they are entitled to summary judgment on Plaintiff's conspiracy claim. A § 1985(3) conspiracy claim requires the following elements be proved:

> (1) the existence of a conspiracy; (2) the purpose of the conspiracy was to deprive any person or class of persons the equal protection or equal privileges and immunities of the law; (3) an act in furtherance of the conspiracy; and (4) injury or deprivation of a federal protected right.

*Royal Oak Entertainment, LLC v. City of Royal Oak*, 205 Fed. Appx. 389 (6th Cir. 2006), *citing Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994). Furthermore, "§ 1985(3) applies only where the discrimination was based on race or membership in another class comprising 'discrete and insular minorities that receive special protection under the Equal Protection Clause because of inherent personal characteristics." *Id.*, *citing Volunteer Med. Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 224 (6th Cir. 1991). As Defendants correctly point out, Plaintiff has failed to allege or provide any evidence indicating that he is entitled to protection based on his race or membership in a class receiving special protection under the Equal Protection Clause. Defendants are therefore entitled to summary judgment on Plaintiff's conspiracy claim.

**State Law Claims**

Defendants argue that they are entitled to summary judgment on Plaintiff's state law claims against them.  Since Plaintiff has pled intentional state torts, governmental immunity is established by showing the following:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
> (c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne County*, 482 Mich. 459, 480 (2008), *citing Ross v. Consumers Power Co.*, 420 Mich. 567 (1984).  Defendants argue that the second element has been met for each of Plaintiff's state law claims.  The second element does not ask whether an officer's conduct was objectively reasonable; rather, it is "subjective in nature.  It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent."  *Odom*, 482 Mich. at 481-82.

With regard to Plaintiff's common law false arrest/false imprisonment and malicious prosecution claims, Defendants argue that Plaintiff cannot show that probable cause was lacking under the heightened intent requirement.  In Michigan, "[a] claim of false arrest requires proof that the arrest lacked probable cause."  *Ghaith v. Rauschenberger*, 2013 WL 195772, at *4 (Mich. App. Jan. 17, 2013), *citing Burns v. Olde Discount Corp.*, 212 Mich. App. 576, 581 (1995).  "Similarly, a malicious prosecution claim requires proof that there was no probable cause for the proceeding."  *Id*.  "A police officer would be entitled to immunity under *Ross* if he honestly believed that he had probable cause to arrest, even if he later learned that he was mistaken."  *Odom*, 482 Mich. at 481.  As was noted before, probable cause existed to arrest Plaintiff.  Furthermore, there is no evidence that, in

arresting Plaintiff, Defendants acted with malicious intent.   Defendants are entitled to summary judgment on Plaintiff's state law false arrest and malicious prosecution claims.

Defendant Bartell also argues that he is entitled to governmental immunity on Plaintiff's assault and battery claims.  Specifically, Defendant Bartell argues that the force used by him was objectively reasonable, and that Plaintiff furthermore cannot show that Defendant Bartell acted with subjective bad faith in applying the use of force that he did. As was noted previously, there are genuine issues of material fact concerning whether Defendant Bartell's use of force was objectively reasonable.  Those same issues preclude the Court from determining whether Defendant Bartell acted with subjective good faith or bad faith in his use of force.  Defendant Bartell is therefore not entitled to governmental immunity on Plaintiff's assault and battery claims against him.

## Conclusion

Defendants' motion for summary judgment [Doc. No. 18] is GRANTED IN PART AND DENIED IN PART.   All claims against Defendant Olson are DISMISSED WITH PREJUDICE.  Additionally, the following claims against Defendant Bartell are DISMISSED WITH PREJUDICE: Plaintiff's § 1985 conspiracy claim; Plaintiff's state and federal malicious prosecution claims; and Plaintiff's state and federal false arrest claims.  The following claims remain pending: Plaintiff's § 1983 excessive force claim against Defendant Bartell; and Plaintiff's state law assault and battery claims against Defendant Bartell.

SO ORDERED.

Dated: _____ 2/20/2013 _____     _____ /s/ R. Allan Edgar _____
                                                    R. Allan Edgar
                                                    United States District Judge